DRURY, Claimant *v.* PASHEN et al.

[No. 101, September Term, 1961.]

*Decided December 7, 1961.*

The cause was argued before BRUNE, C. J., and HENDER-SON, PRESCOTT, HORNEY and MARBURY, JJ.

*K. J. Mackley,* with whom were *Irvine H. Rutledge* and *Lane, Bushong & Byron* on the brief, for appellant.

*Martin V. B. Bostetter,* for appellees.

HORNEY, J., delivered the opinion of the Court.

The question presented by this appeal is whether the trial court was in error when it found that Fred Drury was not the owner of sixteen of the cows claimed by him that had been levied on by the sheriff under several writs of *fieri facias* as property belonging to Nelson Drury.

Fred Drury (the claimant) and Nelson Drury (the judgment debtor) are father and son, respectively, and are often herein referred to as such. As a livestock dealer, the claimant had regularly engaged in the practice of placing dairy cows on the farms of others under an arrangement whereby the dealer retained title to the cows and offspring and the farmer received the milk produced by the cows. The father had such an arrangement with the son.

In August of 1959, the judgment debtor purchased fourteen cows from Sam Pashen (the judgment creditor), and gave him his promissory note for at least a part of the purchase price. Apparently it was on this note that a judgment was entered, and apparently it was under that judgment that two of the executions were issued.

The Sheriff of Washington County went to the farm rented by the judgment debtor from Edison Y. Groh on June 3, 1960, with a writ of *fieri facias*. The judgment debtor was at home and accompanied the sheriff and his deputy to the pasture where fifty or more cows were grazing. (There is a conflict in the evidence as to whether the father was also present on that occasion.) At that time, the son pointed out and the sheriff levied on twenty-three cows—described in the return as "3 Guernsey cows" and "20 Holstein cows"—that the son claimed were his, and, though he did not state to whom the others belonged, he did say they were not his.

Prior to October 18, 1960, a second writ had been issued, and on that date the sheriff found on the farm and levied on thirty milk cows (and one heifer)—described in the return as "30 milk cows (26 black and white [and] 4 red and white)" —despite the protests of the father (and claimant), who was present on that occasion, that twelve or thirteen of the cows (as well as three bulls not in controversy) belonged to him. This was the first time, though it appears he must have known of the previous levy, that the father had told the sheriff that he claimed any of the cows taken in execution. The son (and judgment debtor) was not at home on this occasion.

On December 20, 1960, the sheriff, having received information that cows were being removed from the farm, armed himself with a warrant for the arrest of the son and again

visited the farm. Both the father and son were present on this occasion. At that time, the sheriff saw, and listed, thirty-eight head of cattle by their colors, breeds and ear tag numbers. And when the sheriff demanded that the son account for the cows that had been taken in execution on the two prior occasions, the son, in the presence of the father, stated that the cattle they were then looking at included the same ones taken in execution on June 3, 1960, and the father made no comment one way or the other as to this fact, though he afterwards asserted that he owned all thirty-eight of them and produced vaccination slips that compared with the listed ear tag numbers that had just been recorded. Apparently the son was not arrested.

On December 22, 1960, the sheriff again returned to the farm and made a third levy for the owner of the farm. On this occasion, although the thirty-eight head of cattle last listed were still on the farm, only the thirty cows described in the second levy were scheduled by the sheriff.

At the hearing on the petition of the claimant, in addition to that hereinabove related, there was evidence that after the second levy had been laid, the son, claiming that he had saved the money, made a payment of $1500 on the judgment. There was evidence that after the partial payment, the father, together with the son, called on the judgment creditor to make arrangements for payment of the balance due (which subsequently fell through for want of an endorser on a new note), but made no claim that the property levied on by the judgment creditor belonged to the claimant. There was evidence that between June and December of 1960 the father had transferred cows from his farm to that of the son and vice versa and that there had been an intermingling of the cows of the son with those of the father. There was some evidence that there had been switchings of ear tag numbers as well as the removal and replacement of cows. And there was evidence that there had been misstatements on the government records as to who owned the cows that had been tested for tuberculosis and Bang's disease.

And, in addition to the exhibits produced by both parties

of federal and state test records and vaccine reports, there was testimony by the claimant to the effect that he owned some sixteen of the cows identified by ear tag numbers and/or tattoo marks, and his testimony was corroborated to some extent by the veterinarian who had made the vaccinations. But there was also testimony by another veterinarian that cows cannot be positively identified by their ear tags. And there was documentary evidence that some of the cows claimed by the claimant were listed on the government records as owned by the judgment debtor, though it appears that it is customary to list cows under the name of the farmer who had possession of or was milking them at the time the tests were made.

The trial judge who saw and heard the witnesses, and had an opportunity to judge their credibility and to weigh their testimony, declared, and passed an order to the effect, that some of the cows levied on were the property of the claimant, but he was of the opinion, and so stated, that the claimant had not met the burden of showing that he was the owner of the remaining sixteen cows taken under execution. The judge frankly stated that he did not believe the testimony of the son to the effect that he had never owned any of the cows. And while he did not say that he did not believe the father, he found as a fact that the son, in pledging some of the cows as security for a government loan, and in other ways, had treated the cows as being his property; that the father had transferred cows from his own farm to that of the son at a time when he must have known that a state of "financial turmoil" was in progress there; that there was "planned confusion, transfer and intermingling of cattle from June which did not stop until December"; and that the shifting about of cows was most fortuitous for the father in that all that remained according to the claimant happened to be his property. Furthermore, the judge inferred from other facts that the claimant was not the owner, such as, by his delaying for four months to assert ownership of the cows taken under the first execution; by his omitting to assert ownership of any of the cows at the time he tried to extricate the son from his financial difficulties with the judgment creditor; and by his remaining silent when the son had declared (apparently to avoid

arrest) that the twenty-three cows originally levied on were still on the farm.

In asserting that the trial court was "clearly erroneous" when it found that he had failed to prove ownership of all of the cows levied on, the appellant contends (i) that the return of the sheriff was invalid in that the cows levied on were inadequately described; and (ii) that while he had met the burden of proving ownership, the appellees had offered no evidence to the contrary.

### (i). Validity of Sheriff's Return.

The contention that the return of the sheriff was invalid is without substantial merit. It was, of course, the duty of the sheriff to so describe the cows levied on as to serve to identify them "with reasonable certainty and without difficulty." *Preissman v. Crockett,* 194 Md. 51, 69 A. 2d 797 (1949). The courts, however, differ as to whether a claimant may inquire into or attack the validity or regularity of a judgment or execution. See 33 C.J.S., *Executions,* § 173. But, even if we assume, without deciding, that the claimant had standing to attack the validity of the return, the record is clear—insofar as the description of the sixteen cows still in controversy is concerned—that any inadequacies there may have been in the description of the cows originally levied on was cured by an incident in which the claimant participated.

It may be that in scheduling the cows levied on in June—simply as three Guernsey cows and twenty Holstein cows—they were not identified with reasonable certainty. And it may also be that the thirty cows taken in execution in October—merely as twenty-six black and white and four red and white milk cows—were likewise inadequately described. But it is apparent that the listing—by colors, breeds and ear tag numbers—of the thirty-eight head of cattle made by the sheriff in December, except perhaps as to tattoo marks if there were any, was about as accurate and precise a description as it was possible to give. According to the statement made by the son on that occasion in December—which was never denied by the father who was present and heard it and ostensibly acquiesced therein—the twenty-three cows originally levied on

were among the thirty-eight cattle included in the list made by the sheriff to forestall further unlawful removal of cows levied on and taken in execution. And the father, who had been furnished a copy of the list by the sheriff, subsequently used the same colors, breeds and ear tag numbers when he filed his claim for the sixteen cows in question. Thus, it appears that such inadequacies in the description as may have existed at one time had not only been cured, but were clearly not prejudicial to the claimant under the circumstances.

### (ii). Proof of Ownership.

Although the actual contention on this point is that the evidence adduced by the appellant showed "beyond a reasonable doubt" that all of the cows for which claim was made were owned by the claimant and that the appellees adduced no evidence showing that the claimant was not the owner or any evidence that cast any doubt on the proof of ownership presented by the appellant, the question presented involves a simple one as to whether the appellant had met the burden of proving ownership.

Inasmuch as men and women generally own the property they possess, proof of possession is presumptive proof of ownership. *Guyer v. Snyder,* 133 Md. 19, 104 Atl. 116 (1918). *(Meyer) Motor Car Co. v. First Nat. Bank,* 154 Md. 77, 140 Atl. 34 (1928). And, although it is true that possession of the cows by the judgment debtor at the time the levy was made was not conclusive evidence of ownership, it was at least some evidence of title and was sufficient to require the claimant to establish his claim to the cows by a fair preponderance of the evidence. *Lemp Brewing Co. v. Mantz,* 120 Md. 176, 87 Atl. 814 (1913); *Guyer v. Snyder, supra.* In *Morgan v. Toot,* 182 Md. 601, 606, 35 A. 2d 641 (1944), it was stated that "the burden of proof is on [the claimant], not to show that the property does not belong to the [judgment debtor], which would be requiring proof of a negative, but to show affirmatively that the title to the property is in * * * the claimant."

As hereinbefore stated, the trial court found that the claimant failed to meet the burden of proof and entered a judgment against him, and we cannot say from our review of the evi-

dence and the law under Maryland Rule 886 a that the finding of the lower court was clearly erroneous. We will therefore affirm the judgment.

Since there is nothing in the record to show that the trial court decided the issue as to the ownership of the cows taken in execution, and did not, as the record shows, pass an order with respect to the ownership thereof, there is nothing before us to decide on this point. Rule 885.

*Judgment affirmed; the appellant to pay the costs.*